The first matter on the agenda is case number 123926. People of the state of Illinois v. Shadwick v. King. Counsels? Good morning. Could you please state your name? Yes, of course. I'm Assistant Attorney General Kathryn Dorsch on behalf of the people in this case. This court should reverse the appellate court's judgment, which reversed defendant's murder conviction and remanded for a new trial because it found that no portion of crime scene analyst Mark Zafaric's testimony was admissible under evidence rule 702. The appellate court was simply wrong to think that absolutely no portion of that testimony was admissible. I'm going to paraphrase here, but evidence rule 702 basically says if specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in evidence, then an expert can testify to a point of his opinion if he's qualified as a serious attorney in education. The appellate court broke down Mr. Zafaric's testimony into three categories. I'd like to discuss each one shortly. Ms. Dorsch, let me just ask you, though, when you say no portion, right, it was reversed for a new trial, right, in the appellate court. So if this court was to agree with you, right, but also agreed that a portion of the testimony was not relevant, should have never gone into evidence, are you just asking there to be instruction then at the new trial that some of it would be allowed in a second trial? No, Your Honor, because we've also argued that it was harmless error. Even if it was error, its admission was harmless. But first and foremost, we believe that the testimony was admissible under evidence rule 702. So we're not asking for an advisory opinion. Okay. All right. Thank you. The first category was Zafaric's testimony on the cause of death and lividity. The appellate court apparently recognized that Mr. Zafaric's testimony satisfied that first part of rule 702, saying whether the evidence would be helpful to understand the evidence or determine a fact and issue. Then, that expert testimony would be appropriate on the subject of the cause of death and lividity. But what the appellate court said was that Mr. Zafaric was not qualified on the second part of rule 702 because he didn't have a medical degree. And that's where the appellate court went wrong. Because there's no part of rule 702 and no case or rule of this court that says that one must have a medical degree to provide expert testimony on the cause of death or lividity. Instead, the question is whether expert testimony is required. And on this point, Zafaric was amply qualified to provide an opinion and testify about both the cause of death and lividity. We state in our brief, Mr. Zafaric had a bachelor's degree in physiology and a graduate degree in criminology. He had 30 years of law experience, the bulk of it with the FBI, in which he either worked on, analyzed, or studied thousands of violent death cases, many of them murders. And he also worked on the strangulation study. At the time of the trial, he coordinated all the research and he was getting ready to publish a peer-reviewed paper on strangulation. So all of this training, this combination of training, education, and experience, amply qualified him to provide a cause of death and lividity. And so the degree in physiology, was it an animal physiology or human physiology? And if it was animal, does that make a difference? The record in this record, in Mr. King's case, says physiology. It doesn't say human or physiology. So your answer is you don't know? My answer is that the record on this case doesn't say. Looking outside the record on this case, and perhaps looking through the statements made in the amicus brief, the amicus say that there was a degree in animal physiology. So I can tell you that, but that's not in his record. And my further answer would be that it doesn't matter at all. He's got all the other experience. Nothing required him to have a degree in physiology at all, as long as he's qualified by his training, his experience, and to provide this sort of testimony. Counsel, can someone without a medical degree determine cause of death in any other circumstance, other than a criminal trial like this, a murder? Sure. There are cases from this court where there's late testimony on cause of death. The case I'm thinking of, the name escapes me, but basically it's so obvious that it's in the common experience of the average person. If I walk in and I see someone shoot somebody in the next office, and he falls over, and he's laying in a pool of blood, and EMTs come and pick him up and carry him away, and he's dead, then that person would be qualified to testify that the cause of death was a shooter. Well, keeping with that theme, what in Mr. Seferik's background would qualify him to establish cause of death in the first instance? He's looking, so he's synthesizing all of the evidence. He is an expert. Experts don't need to be, they don't need to provide scientific testimony. He's synthesizing, he's got the MEs reports, and he knows what's in the MEs report. He's looking at all the physical evidence, he's looking at the circumstantial evidence, and based on his 25 plus years... Yeah, I'm talking about being presented with a corpse and establishing cause of death for himself, not looking at reports. What about his background would allow him to do that? I don't think that he could. He testified that he could not go, he's not a medical examiner, he could not go to the medical exam and determine, he couldn't, say, dissect the neck structure and determine whether there were signs of strangulation. But he didn't represent that he could, that they could not present him as a medical expert. The jury was not led to believe that his testimony was scientific or medical testimony, just that it was expert testimony based on his experience. Well, he still needs a foundation, right, to be able to do that? I mean, even if he could say that there's been strangulation in this instance, what about his background would allow him to say that, and that was the cause of death? His background, his experience in researching 4,000 plus cases, working on studying cases,  so the way we, excuse me, the way we test the validity of expert opinion testimony is we look at the basis of their opinion, test it on cross-examination. So, Mr. Seferag, you're not a medical doctor, right? No, I'm not. Well, how do you qualify? Well, I can look at all this information and based on all this information, my experience, my opinion, within the realm of my qualifications as a crime scene analyst, to find that this victim died as a result of strangulation. And the Wisconsin case that we cited in our briefs, well, he has persuasive authority because the Wisconsin Appellate Court there held that Mr. Seferag could provide cause of death testimony in that case because he had the requisite knowledge and experience, and he was providing helpful answers to the jury that they could use in determining whether the victims in that case had died of natural causes or it was a homicide. And, of course, that was the key dispute in this case because there was medical evidence on each side. Correct, and as well as the Wisconsin case, there was some question whether they had died as a result of natural causes or whether they acted. That case wasn't a strangulation case. It was a smothering case, but it was an asphyxiation case. As I mentioned earlier in the answer to Justice Thomas' question, even if this Court would find it inadvisable to allow non-medical experts to apply that cause of death, the Court should hold that any error in admitting that testimony was harmless. Use of the competent evidence in the record would establish the defendant's guilt beyond a reasonable doubt, and a retrial even without Seferag's testimony would not produce a different result. This case does not present the battle of equally qualified experts at the Appellate Court, but it did. I'm sure Dr. Bloom testified on direct examination because he didn't observe any drag marks on the victim's body that she must have been running on the railroad tracks. She couldn't have fallen directly from a standing position because she would have different injuries, but he posited that maybe she sat down and sort of crumpled with her arms and everything to one side of the track and her neck over the track and her phone on the other side of the track. It could have been the result of a sudden cardiac event caused by stress, sleep deprivation, caffeine, alcohol. But the testimony was thoroughly impeached on cross-examination. On cross-examination, he conceded that the doctor who conducted the autopsy, Dr. Calotar, would have had a better opportunity to view the body and that the benefit of the doubt should go to Dr. Calotar as the medical examiner unless it were totally overruled by the other evidence, is what he said. Then he went on to concede that it wasn't totally overruled by the other evidence because he could not himself outrule or overrule asphyxia as the cause of death. And he agreed that most people who die of a sudden cardiac arrhythmia have coronary artery disease and Kay did not. In rebuttal, Dr. Calotar testified that Dr. Bloom's testimony was a scare projection. It ignored the fact that she had seen the best shape of her life having just returned from military training. She did exhibit a- Was there evidence of injury to her neck? Yes. There was a red mark on her neck. They called it an arrhythmia. There are bruises. I guess I have a point because they call this the submental area here beneath the chin and over here on the side, yes. But not the kind of ligature marks, not the smoking gun type of- Not the classic strangulation injury. If anything, this record shows that there is no real classic strangulation injury. Both experts agreed in this case that there's no particular- None of these things- There's no sort of an aha, if you have this factor, then it's a strangulation. They said no, they don't have that. Here what you have that made Dr. Calotar conclude that it was a strangulation. You have those pinpoint hemorrhages. You have hemorrhages in the laryngitis, the epiglottic mucosa, and the laryngeal mucosa. And you have vocal hemorrhages at the base of the tongue. She explained that these places hemorrhage because there's pressure placed on the neck and the blood can't flow back out. You're placing pressure on the vein. So there's no place for the blood to go and you get these small hemorrhages. Again, Dr. Calotar said that in addition to ignoring the fact that it takes some of the best health of her life, you're ignoring that she didn't have any of the signs that are typically seen as warning signs of sudden arrhythmic death, so dizziness, shortness of breath. Her clothing was in complete disarray. It's inconsistent with having just gone for a run that morning. She never ran on the railroad tracks. So the things that Mr. Safaric testified to, aren't those the matters that an ordinary lay person juror could discern themselves and that Safaric had actually formed those conclusions for them? That gets to my next point. Yes, ma'am. Thank you. No, that's not really the test. The second category of evidence is what they talked about, crime scene evidence or staging testimony. At that point, the appellate court apparently found that he was qualified to testify about staging, but that it shouldn't be permitted because it wasn't necessary, because the jury could reach some of these same conclusions themselves. But that analysis just applies to the wrong standard. The standard is not necessity, but whether it's helpful. It's helpful to the jury, which Safaric's staging testimony plainly was, because it's beyond the common experience of the average juror. It doesn't have to be absolute necessity. It doesn't have to be something that the jurist couldn't determine without his help. It just has to be helpful. And at least two jurisdictions and cases we cited in our brief have held that Safaric's testimony on staging and crime scene analysis was helpful, that it satisfied Group 702's test. Again, getting back to Justice Thomas's point, if the appellate court was correct that the staging testimony or the crime scene analysis testimony was common knowledge, at most that testimony is harmless under this Court's opinion in Mertz. An expert, a profiler, was asked to compare two murders at an apartment fire and determine whether the same person who had committed all three crimes, and how this term, profile, crime, corresponds. The same expert was also asked to determine whether the person who had committed all these things was defendant, so profile defendant corresponds. But Safaric did none of those things here. He did not directly identify. He did not directly identify from his testimony. So it's not the sort of profiling testimony that occurred in Mertz. In fact, there's only one small portion of Safaric's testimony that defendant challenges as profiling. Safaric testified that the crime scene appeared to be staged to make it look like an accident, to make it look like she had been running and falling on the tracks. And he went on to say that strangers don't need to stage crime scenes because they don't need to deflect the investigation away from them. But in so saying, he is not identifying the defendant as the perpetrator of this crime. At most, he's saying that any non-stranger in her life, it's consistent with any non-stranger, this crime scene is consistent with any non-stranger in her life as having committed the crime. But he did not identify the defendant as that person. Instead, the state's other evidence narrowed down all the non-strangers in Kate's life. And that evidence convicts the jury that the defendant was the one who committed this crime. So for all of those three reasons, the public court was wrong to hold that his crime scene analysis testimony was inadmissible, but this court would find that any portion of it wasn't inadmissible, any error was harmless. We've touched upon it, but can you just quickly go through which of Mr. Safaric's conclusions were beyond the canon of the average juror? It's not that any one particular... I guess my first answer would be that not any one particular conclusion is beyond the canon. The benefit, the value of Mr. Safaric's testimony, laying his ability to take all of this evidence, all of these little pieces of evidence that don't necessarily make sense, and synthesize them all in light of his experience presents a complete picture of what's happening. Isn't that what closing argument's all about? It can be. So we have a so-called expert on the stand giving testimony regarding pulling from the circumstantial evidence to what a juror could do with or without that testimony, right? No, I disagree, Your Honor. Some of it, yes. Some of it the jury could conclude on its own that a person is unlikely, an avid runner is unlikely to go out running without liner shorts or underwear beneath their shorts. But an average juror in a case where there's... Jurors are not familiar with murder cases. They're not familiar with crime scenes. They're not familiar with staged crime scenes, or cases where there's no confession, there's no weapon, you've got to find information, synthesize it all from this information set. How do you think about the topic? Is there anything that the prosecutor could not have told the jury in closing argument based on how the evidence came in that was said by Mr. Safaric on those issues? No, nothing presented to the prosecutor for making that argument. That's not the standard. The state doesn't have to refrain from presenting evidence. No, but the standard is it has to be beyond the account of the average juror, and if the prosecutor could make the same argument with or without Mr. Safaric, you would think that the average juror could understand it without Mr. Safaric, right? I still disagree. I respectfully disagree, Judge. And just quickly on the harmless error, Mr. Safaric's testimony takes up 200 pages, over 200 pages, I think, of the report of proceedings. Correct, about 120 in direct, 120 in cross. And you would say that all that testimony was still harmless. Without it, it would not have changed the outcome. Yes. Okay. I just have a few minutes here I'd like to briefly touch on. Two issues that the appellate court said were likely to recur in the amendment. They didn't reverse on this basis, and there's no basis to reverse. So when the first defendant challenged 602 pieces of testimony, he claimed they were improperly introduced solely for the prejudicial impact and to garner the sympathy of the jurors. Most of those are forfeited, at least half of those are forfeited, and you can't excuse the forfeiture because there's really no error at all. Thank you. Thank you, counsel. Mr. Carter. May it please the Court, Madam Chief Justice, my name is Matthew Carter, and I'm pro bono counsel for Mr. Shadwick King. The second district, in what was a very thorough and well-reasoned opinion, found that Mr. King was entitled to a new trial based on the testimony of Mr. Safar. You've heard a lot about it already this morning. That was right for at least three reasons independently and taken together that clearly show that his testimony was prejudicial and not broken. To start with, he testified on several subjects that he did not have expertise to testify about, the cause of death, lividity, and vegetation. He also testified on subjects the commentators didn't understand, and he provided profiling testimony and did indirectly, as the second district found, what the trial court said it shouldn't do directly, which is to identify Mr. King as a murderer. All of those reasons independently taken together support a new trial. A new trial was also warranted for three other reasons. First, the emotional testimony of Mrs. King's family. Second, because of improper statements at closing argument. And third, because he was improperly denied his right to a substitution judge. And then when you look back and you consider the evidence that was presented and is in the record, this court should find that an outright reversal is warranted and that the evidence is still satisfactory and probably for no reasonable jury to convict. So let me start with the Safar argument, and I'll start with the first prong of that argument, which is that he testified on subjects that he's not qualified to testify about. He's a retired law enforcement officer. He has years and years of experience with that. But he's not a medical doctor. He's not a forensic pathologist. And this is a case where medical testimony, that kind of scientific expertise, was necessary. And both sides recognize that. This is not a case where it's a gunshot wound or a stab, where a non-medical expert might have some basis to come in and testify about what happened. This was a case where Mrs. King was found dead on the railroad tracks, and there wasn't an obvious cause of death. And so both sides recognized that. The state called Dr. Kaliklar to testify, and Mr. King called Dr. Bloom. And they had inconsistent testimony, it's fair to say. But if you look at Dr. Kaliklar's testimony, when she performed the autopsy the day after Mrs. King was found, she had no definite opinion on the cause of death. And then a month and a week later, when she filed her autopsy report, she filed a report that said the cause of death was asphyxiation, but she could not list homicide and she could not list the cause as manual strangulation. And it wasn't until she actually testified at trial, during the trial, that she finally came around to manual strangulation. And, of course, that was after Mr. Safarek was already hired, and had come to that conclusion based on his review of the record. So essentially what the state did here with Safarek's testimony is go way too far, because the state used, and said this at the appellate court, they used Safarek's testimony to plug the holes in Dr. Kaliklar's evidence. And he plugged the holes in a way that went further than Dr. Kaliklar, by testifying that he ruled out any other form of asphyxiation, he provided extensive opinions on libidity, and, as Justice Thomas noted, he was on the stand for a very long time testifying about these medical subjects. Because he doesn't have the qualifications to do that, the Second District was right when it ordered a new trial based on that. The next reason Safarek's testimony was prejudicial and improper was his crime scene analysis testimony. And I'll start there with another subject that he testified to that he wasn't qualified to testify to, and that was the vegetation of the scene of the crime. Now the state had a theory of what happened here, and it was the theory that Mrs. King was murdered at her house and moved to the railroad tracks. And one piece of evidence that the state tried to use to support that theory was that there were leaves found on her body, that Mr. Safarek came in and testified, inconsistent with what was found around the railroad tracks, but consistent with what was found at her house. But he's not a botanist, he's not a plant DNA expert, he's a law enforcement officer. And the state tried to find an expert, a qualified expert, to testify about vegetation, and it couldn't do it. So the state, there's stipulation in the record, it's record 1737 to 1739, where the state stipulates that they went to Morton Arboretum and they went to the University of Illinois in Chicago to try and find an expert who could directly tie the leaves on the body to the leaves that were found in her house, and they couldn't do that. And so instead, they just had Safarek testify to that. That's unfair. Could he have testified that the leaves found at the railroad track were all pin oak leaves and there were no pin oaks around, but there were pin oaks in their home? I don't think he has the qualification to testify to that. Again, he's not... You know, I gathered leaves as a grade schooler and had to make a book on gathering leaves. I'm not an expert, but I can tell the difference between pin oaks and maple and others. Well, Your Honor, if that's kind of the problem with his testimony, is that, well, you don't need expert testimony, then that's a problem, too. And that's the reason that all or most of the rest of his testimony about the crime scene was improper because it was subjects that the average juror could decide and understand on his own by looking at the record. But somebody would have to testify as to what the leaves looked like there and what the leaves looked like at home. That's right. But you could have, for example, a lay witness testify to that, but not necessarily someone who's purportedly an expert. Okay. And so this common knowledge testimony that he provided was, again, testimony that was really just closing argument halfway through the trial. It was taking the evidence that the State had developed from lay witnesses and putting it together and, as counsel just said, synthesizing it. And that's not fair. If the common juror can understand what's going on with the evidence, the juror should be able to make that decision, not with a veneer of expertise. And you think about, in today's day and age, and even in Mr. Safarek's testimony, one of the pieces of information they listed is that he was an FBI profiler, like the people that worked on the case in Silence of the Lambs. And you turn on the TV and there's profilers everywhere. They over-persuade the jury. And that's why that was improper. So any profiling testimony is improper? Our argument is, yes, that profiling testimony should be, per se, inadmissible. And when you look at the trends in the decisions, you will find states that are finding that, that profiling testimony is, per se, inadmissible. So you've got Washington, it's the Crow case, that reaffirmed an earlier decision, the Thoreau case. Massachusetts holds profiling testimony essentially, per se, inadmissible. And Arizona. And you also find a raft of cases, and we cited them, or amicus brief cited them, that find profiling testimony like the testimony that Mr. Siparic provided improper, prejudicial, and not probative. And so the great weight of authority is coming out of holding against profiling testimony. We didn't find any cases allowing profiling testimony, per se, of course. But also the two cases at the state sites that would suggest that Mr. Siparic's testimony could come in were the Swope case in Wisconsin and then there's the Jackson case in California. But those cases are both distinguishable because it's different expert standards. In the Swope case, Wisconsin Supreme Court recognized that its expert standard is uniquely lenient. And in the California case, the law allows experts to testify about matters of common understanding. And that's not what the law allows in Illinois. Is any testimony appropriate by an expert to describe staging? Not to describe staging. I'm not saying that no expert could testify about crime scenes. I think I could conceive of an expert who might be able to testify either in a scientific way or some specialized way about a crime scene. But staging falls right into the realm of profiling. And so courts have found profiling to be when a witness makes an observation about common practice, habits, and characteristics of a group of people and then applies that to suggest a particular person is a perpetrator or an offender. And it's unfair because instead of focusing on whether this particular person is guilty of a crime charge, it's just defining a characteristic in a group of people and saying, because that group of people might do this, then this person did. So it's not focusing on the actual evidence but just on what other people are doing. And that's unfair. And that's what this staging testimony was. So what Mr. Szafarek did was he testified about the type of people who stage crime scenes and that the type of people who stage crime scenes are people that believe that law enforcement is going to naturally be looking at them. And then he testified that it's people that are close to the victim. And under the circumstances of this case, when you consider the timeline, the only person that could fit is Mr. King. And so the pro-founding testimony was one reason that that's improper. And then the fact that it does, as the Second District said, indirectly what the trial court said he shouldn't do directly, which is identify Mr. King as the offender, that's also improper. So the Second District definitely got it right when it found a new trial was warranted based on Mr. Szafarek's testimony. That testimony wasn't harmless. It contributed to Mr. King's conviction. It was one of the last things that the State mentioned in the rebuttal closing argument. It was very lengthy. It did synthesize the evidence, which I think is improper on its own. So it did contribute to Mr. King's conviction. The evidence in this case wasn't otherwise overwhelming, and the testimony wasn't cumulative in the Second District. The State admitted that it was testimony that plugged the holes. So Szafarek warrants a new trial. There's other reasons that it was courted a new trial as well, and that starts with the emotional testimony of Mrs. King's family. Now we have to remember that what we have here is a murder trial, a guilt or innocence trial, not a sentencing hearing. So it's one thing when family members testify to an emotional reaction at a sentencing hearing, but it's quite another when you have a trial, a closely balanced trial like this. So the State elicited, and the trial court allowed over objection, the State to elicit testimony about the sisters' close bond with Mrs. King, the motherly role that Mrs. King played for her, that she purchased her wedding dress and the frantic emotional reaction to the news of her death. And even when you look at the transcript, you'll see that this was, and it's not surprising that it was, highly emotional testimony. She was crying. They had to take breaks. And so it was very emotional testimony, and it was really only designed to prejudice the jury against the defendant. There's no reasonable basis for that. How do you address the State's argument that Kathleen's habits and that the closeness between the sisters would indicate what the appearance at the time of death would be like because of the closeness? That goes to the State's theory that she was running, and so what would a person run? So maybe if you're close to a person, you would know what she might wear running. And there is proper testimony that could and did come in on that, such as how often did you stay at a house with Kathleen overnight? There was other testimony that came in about what she actually wore running and things like that. But the close bond and then going even further afield, whether her sister bought her a wedding dress or played a motherly role, that doesn't shed any light on the type of habits. Does it make a difference that the testimony was elicited in response to defense counsel's objection that Christine lacked sufficient knowledge of Kathleen's habits to testify to them? Namely, the wedding dress and how close they were, that the jury could take a look at that and say, hey, no, she knew her pretty well. They were pretty close. She would know the habits, especially since the defense was arguing that she would not know the habits. I don't see how whether her sister bought her a wedding dress or not could have anything to do with what she would wear on a run or a walk or going out in the morning after a night out. Mrs. King's sister went further in her testimony and essentially identified Mr. King as her sister's murderer, and that was another improper testimony that was elicited by the state, which the Second District recognized. And all of this testimony, there's just no legitimate reason for it. And then the state came back to it when they called Mrs. King's father to testify to his emotional reaction when he found out that his daughter was dead. And on this issue, one argument that the state made was that one person's emotional reaction would bear on the consciousness and guilt of another, but people react to emotional and stressful situations in different ways, and how one person reacts has nothing to do with how another person reacts. The next reason a new trial was warranted was that the state diluted its burden of proof and the reasonable doubt standard. The state told the jury it was okay to have questions and still convict the defendant, and it did that after identifying what was one of the key pieces of evidence that the defendant, in closing argument, argued was lacking, which was how would, according to the state's theory, how would Mr. King get a body to the railroad tracks without anybody seeing it, hearing his truck, and that. And what that was doing was essentially just defining the reasonable doubt standard by what it wasn't and defining it against the defendant's defense, and that's unfair, and that warrants a new trial as well. When you look at our briefing and the record, forfeiture shouldn't be an issue at all on the emotional testimony. There were multiple objections. There were sidebars. It's in the post-trial motion. I will grant that there are not objections on the closing argument statements. However, that was plain error when you consider how close this case was. It tipped the scales against the defendant. The next issue that warrants a new trial is the trial court's improper denial of substitution of judge, and this was a purely procedural matter. Very early on in the case, the state filed a motion for cell phone records, and the defense objected on the process and whether a warrant was necessary or not. Clearly this evidence, the cell phone evidence, was relevant. Both sides would want it because the cell phone evidence could be inculpatory or exculpatory, and clearly both sides would want it. And so when the defense objected, it wasn't going to an issue on the merits of substance. It was just going to process. And in that situation, there's no reason that Mr. King shouldn't have been able, after the trial court made a decision on that issue, to take his substitution of judge. That also requires reversal in the trial. Finally, we get to double jeopardy, and when the court looks closely at the evidence, I think the court will find that it's so improbable and so unsatisfactory that there's no reason for a new trial here. There's no DNA evidence. There's nothing to tie Mr. King to the scene of what the state argues is a crime. There's no confession. There's no admission. So the state presented a theory of what happened here, but it did not prove to be on a reasonable doubt, and it cannot prove to be on a reasonable doubt. Mr. King was entitled to a trial based on facts, not on speculation and emotions. He didn't get it. The state went way too far with Mr. Shafareff's testimony and went way too far with the emotional testimony from the family. For those reasons, a new trial is warranted. And, again, when you look at the record, I think that you should find that an outright reversal is appropriate. Thank you. Thank you, Mr. Carter. Ms. Storch? I didn't get to the leaf testimony. I have not made a leaf vote, but Mr. Shafareff didn't purport to testify. I want to make a correction. Mr. Shafareff didn't purport to testify. The leaves in the home were the very same kind of leaves as the leaves at Werner's Shore. Instead, his testimony was a little different. His testimony was that, well, there are no leaves on the tracks. This is July. There are not leaves where her body is found. There are leaves in her home. There are leaves in the kitchen, leaves on the sheets in the bedroom, and leaves in the front porch. Her clothing came from the home. It's his theory that she was dressed at home in clothing from the home, and that's how the leaves came to be. The leaf fragments came to be included inside the shorts, in her hair, and under her arm. So he wasn't purporting to provide expert testimony. He was matching the leaves from the home, and the state did try to get that testimony. The state did everything they could to try to get scientific testimony at that point, but the substances, the samples were just to try that. On the supposedly overly emotional testimony, many, at least half of them, forfeited the complaint of remarks, as Justice Thomas mentioned earlier. Can we go back to the leaves a minute? Sure. Isn't that the very problem with it, that you didn't have expert testimony attached? Let me tell you where I'm coming from. And closing argument again. Defense counsel can argue the leaves one way, and the prosecutor can argue it the other way. And the prosecutor then, let's just say upon rebuttal, says, yeah, you've heard two different theories of the leaves, but I had an expert. I had an expert to tell you there were leaves in the house, there's leaves on the body, the leaves came from the house. He's not in ñ is that an expert theory, or is that having someone come in that is ostensibly an expert to tell the jury, my opinion makes a greater difference than everybody else's? It is expert opinion testimony. Here's what we have to distinguish between scientific expert. He's not a leaf expert. He's not a leaf expert. He's someone that sees there's leaves in the house and leaves on the body, so the leaves on the body came from the house. Couldn't the jury do that without Mr. Seferic? They could, but again, the standard is not necessity. The question is whether it's helpful to find all these pieces of information. Well, why is his opinion worth more than anybody else? Why is he an expert on that issue? He's an expert on privacy and analysis. Okay. I mean, it is a matter of logic, but they've explained it's one piece of the larger puzzle. Again, this is a case where there's a lot of pieces of evidence, and we haven't even gotten to the phone records. It sounds like something Judge Carmeier could do. We did the leaf book. I mean, do we really need an expert to say that? Well, then we'd be challenging the admissibility of Judge Carmeier's testimony. Yeah, I don't want to do that. I just wanted to point out that he didn't purport to make any kind of scientific statement that identified the genus and species of the leaves. It was just merely a more logical, you know, explaining his theory and how, in the context of his theory, that those leaves came to be included in her clothing and her hair and under her arm. So he's an expert at drawing inferences. He's an expert at drawing inferences better than the jurors or the attorneys trying the case and closing argument can draw inferences. In light of his experience, and he's an expert in drawing inferences about crime scenes, not necessarily anything else. He may be terrible at it in the elder context, but in the context of crime scene analysis and his 30-plus years of experience, he is an expert in drawing inferences. And all of this is challenging. It can be challenged on, you know, it's opinion testimony. Challengable, just like other opinion testimony may be obvious. The defense could ask him about the basis of opinion testimony. So if the amicus brief, and I think what the defendant was hinting at, somehow all evidence in a murder case must be scientific evidence. If it's simply not true, you have expert opinion testimony. It's not inadmissible simply because it's not scientific testimony. But it seems to me that this forensic testimony that he provided, he may be an expert in some areas, I'm not sure which, but he seems to be putting all the puzzles together and drawing an inference. So why do we need expert testimony if someone like Safar can be testifying to inferences all the time and letting the jury know what his opinion is in a way that appears to be expert testimony, but it really isn't? I'm going to disagree with you that it really isn't expert testimony. It is expert testimony. It's not scientific expert testimony. It's expert opinion testimony. And the reason it's important, and the reason the Wisconsin Appellate Court admitted it, the reason the California Court admitted it, is because it's helpful to the jury. They don't have experiences with crime scenes, murders, much less cases like this where piecing together information from the crime scene, piecing together information from the text messages. So it is expert testimony, and it is admissible. It's just expert opinion testimony. Would the state be allowed in any case, any homicide case, to call a homicide detective who had been on the force for years to look at all the evidence and then offer an opinion based on the crime scene that this is how this all went down? Yes. Is that what you're saying? In every case you could do that? Yes, they could. I don't know that they would. And the court need not be concerned. It seems to be sort of a concern, sort of the elephant in the room as well. What if the state's not going to present medical expert testimony in murder cases? There's no cause for concern that the state would somehow substitute opinion testimony in lieu of expert medical testimony in these cases, because certainly a jury is likely to give more credence to an expert physician's testimony than a positive death pathologist. So if that's your concern, I don't think that's well-founded. But it's like accident reconstruction testimony. It would be admissible. Isn't it a concern that it over-persuades the jury? In other words, they listen to the evidence, they listen to the closing arguments. Well, this guy's an expert. He's looked at it. He thinks this guy's guilty. So, you know, I think he's got a lot more experience than I've had. So that's how it over-persuades the jury, isn't it? I disagree that crime scene analysis testimony would over-persuade profiling testimony. It could very well over-persuade where an expert would say, well, this guy does work in other contexts as a profiler, but he wasn't asked to provide profiling testimony here. Certainly in the context of profiling testimony, if the FBI analyst said, I developed his profile, I looked at the evidence, and everything points to a man in his middle 40s who's about, oh, he had to be about 6'4 to carry her down to the railroad tracks and basically creates a profile that matches the description of the defendant, that evidence or testimony could over-persuade. But there's only that one very tiny portion. This case is not about profiling quite frankly. This court need not reach the question of admissibility of profiling because the only portion of this affair that's challenging, testimony that they're challenging is profiling. It's that little bit where it says that strangers don't have to stage murder scenes. This is really not an occasion to reach that kind of evidence either. I'm running out of time. I'm going to rely on my brief for our closing argument and substitution of judge. Just briefly, there's no merit to the defendant's claim that the evidence was insufficient. He's taken a leave of absence. He absolutely had a motive to kill her. He took a leave of absence from his job so she could pursue her dream of military training. He comes home. He finds out that she's met somebody at military training. He chucks a phone into a pond. They get new phones. In 17 days, she owned that new phone. The victim exchanged 3,499 text messages with this new, I don't know if he's a boyfriend, but he's certainly a love interest. He thinks they're having a nice time when they're going out on the night before her murder. He thinks they're having a great time at the bar. When he gets home, he realizes the checks are phoning. He sees all these text messages from the boyfriend saying, Oh, yeah, will you marry me? We've got the physical evidence. Mr. King admitted she never goes running on the railroad tracks. Her injuries are inconsistent with a fall when running on the railroad tracks. All of these things come together really to make it clear that it wasn't an accident and that Mr. King did asphyxiate his wife in the home and bring her body to the railroad track. If we should agree with you, would we be, in effect, approving a new form of expert who can, in the words you used in your brief and you used in arguments, synthesize the circumstantial evidence? No, this Court need not use those exact words. In this particular case, this particular case where there was little bits of evidence here and there, it need not synthesize, need not use the word synthesize. The point is that it's like accident reconstruction testimony. It's crime scene reconstruction testimony. It's admissible because it's helpful and because the experts qualify to give his opinion on it. It's scientific testimony and it can be tested sufficiently across the examination. If the Court has no further questions, we ask that the Court reverse the appellate court judgment and affirm Mr. King's conviction. Thank you, Ms. Dorff and Mr. Carter, for your presentation this morning.